**Roland ROUSSELL,**
**Petitioner–Appellant,**

v.

**Larry JEANE, Warden, et al.,**
**Respondents–Appellees.**

No. 86–3352.

United States Court of Appeals,
Fifth Circuit.

April 28, 1988.

Julian R. Murray, Jr., Murray, Braden, Gonzalez & Richardson, New Orleans, La., for petitioner-appellant.

Gregory C. Champagne, Kurt Sins, Asst. Dist. Attys., Hahnville, La., for respondents-appellees.

Before KING, WILLIAMS, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Petitioner–appellant Roland Roussell shot his wife and was convicted of manslaughter by a Louisiana jury. The district court denied Roussell's petition for the writ of habeas corpus, and we affirm.

**Facts and Proceedings Below**

In describing the crime, we quote from the Louisiana Supreme Court opinion affirming Roussell's conviction and sentence, *State v. Roussel*,[1] 424 So.2d 226, 227–28 (La.1982):

"[On November 28, 1980] Roland Roussel[l] ... fatally shot his wife, Dara Ann Roussel[l]. Although they had been married only four months, they had separated on several occasions due to Dara Ann's alleged use of drugs.... Prior to the shooting, they had again separat-

ed.... Dara Ann had spent several nights prior to the shooting at the trailer of her grandparents (the Oubres).

"On the day of the shooting, Dara Ann picked up defendant at his place of employment. They returned to the trailer to get her belongings before returning home. While Dara Ann was packing, defendant left to purchase some beer at a nearby convenience store. Upon returning, Dara Ann's behavior had dramatically changed to that consistent with her behavior when on drugs. She was extremely upset about losing her purse. Defendant called her cousin, Leatrice Mitchell, to come to the trailer which she did. David Mitchell followed his wife a short while later. According to his testimony, Dara Ann was visibly upset. Defendant was in possession of a .22 caliber revolver which he carried for protection in connection with his employment. Defendant removed the gun from his pants and placed it in the right pocket of his jacket....

"Mrs. Oubre testified that she questioned defendant about the gun when she arrived. Upon denying he had one, she suggested it would be better if he left. Defendant agreed to go but did not leave immediately because he wanted to explain to Mrs. Oubre that what Dara Ann was saying about him was not true.... Then the phone rang; it was Dara Ann's mother. Dara Ann told her that defendant was going to kill her. Mrs. Oubre took the phone. Defendant asked to talk with Dara Ann's mother. Mrs. Oubre passed him the phone but Dara Ann's mother had hung up....

"Defendant testified that he was very nervous and upset at this point and had decided to leave. The 'noise and hostility' from his wife's family had him crying and his hands were bunched in his pockets, his right hand wrapped around the outside of his pistol, squeezing it very tightly. He remembered walking toward Dara Ann and her grandmother (Mrs.

1. The style of the state case (and some references in the record) suggests that Roussell spells his last name with only one "l." However, there is a signature of Roussell's in the record from his state trial, and this shows that he spells his last name with two "l's."

Oubre) who were standing near the table where his belongings were located and hearing a shot fired, but did not know how it was fired, by whom, or that anyone was hit."

The shot that Roussell heard came from his own pistol and it killed his wife. David Mitchell wrestled Roussell to the floor and held him until police arrived.

The state originally charged Roussell with first degree murder, La.Rev.Stat. § 14:30. Roussell pleaded "not guilty and not guilty by reason of insanity."[2] The day before trial began, the state dropped the charge to second degree murder, La. Rev.Stat. § 14:30.1, and Roussell changed his plea to simply "not guilty." The jury found Roussell guilty of manslaughter, La. Rev.Stat. § 14:31, a responsive verdict to a charge of second degree murder, and the court sentenced Roussell to the maximum term for manslaughter in Louisiana—twenty-one years, *id.*—plus two more years for using a firearm in an offense, La.Rev.Stat. § 14:95.2.

Roussell appealed to the Louisiana Supreme Court, which affirmed the conviction and sentence. *State v. Roussel,*[3] 424 So.2d 226 (La.1982). Roussell then sought the writ of habeas corpus from the United States District Court for the Eastern District of Louisiana. 28 U.S.C. § 2254. That court denied Roussell's petition; on appeal, this Court dismissed Roussell's petition for failure to exhaust his state remedies. *Roussell v. King*, 762 F.2d 1002 (5th Cir. 1985). Roussell then collaterally attacked his conviction and sentence in the state courts without success, and thereafter filed this, his second federal petition. This sec-

ond petition raises only two issues: (1) the state trial court's refusal to permit testimony from a psychiatrist that Roussell's inability to remember events just after the shooting was caused by repressive amnesia; and (2) the state trial court's alleged reliance on an assertedly improper factor—that court's view that the evidence was more consistent with second degree murder than manslaughter—in assessing the maximum penalty for manslaughter.

The court below rejected Roussell's petition. As to the first issue, the court held that the Sixth Amendment was not violated by exclusion of the psychiatrist's testimony because the psychiatrist had no direct knowledge of the facts of the offense and "could not add any fact or opinion which would effect [*sic*] Roussell's guilt or innocence." Regarding Roussell's second claim, the district court held that the state sentencing court was not under the misimpression that the jury had convicted Roussell of second degree murder; therefore, the sentence was not based on false assumptions, or any other constitutionally infirm rationale.

**Discussion**

We will discuss each of Roussell's contentions in turn.

*I. Psychiatric Testimony*

Roussell testified in some detail regarding events up to and including the moment he heard the shot. However, he claimed to be unable to remember events in the moments starting just after the shot and continuing until he was pinned on the trailer floor by Mitchell. In anticipation of prov-

2. This combined plea is authorized by La.Code Crim.Proc. art. 651. Footnote 4 explains why Roussell entered this plea.

3. One of the points that Roussell raised in his state direct appeal, but which he has not asserted before us, is that the state denied him due process by adding two years under La.Rev.Stat. § 14:95.2 to his manslaughter sentence, though he was not charged with a violation of that statute. The Louisiana Supreme Court rejected this challenge on grounds that La.Rev.Stat. § 14:95.2 "does not create a separate crime. Rather, it mandates that an additional penalty be imposed when a person uses a firearm or

explosive device at the time he commits certain crimes." 424 So.2d at 232. The Louisiana Supreme Court has since overruled this portion of *Roussel* and now holds that the defendant cannot be sentenced under La.Rev.Stat. § 14:95.2 unless he is charged with violating that statute. *State v. Jackson*, 480 So.2d 263, 268–69 (La. 1985). By its terms, *Jackson* would not apply to Roussell because his case had been reviewed on direct appeal three years previously; *Jackson* does not apply to convictions that had been finalized on direct review by the time it was decided. *Id.* at 269.

ing an insanity defense, Roussell had been examined by three psychiatrists. One of these, Dr. Scrignar, would have testified at trial that in his opinion Roussell was suffering from repressive amnesia, a deficiency that prevented him from remembering the events in that brief interval of time after the shot. Dr. Scrignar would have testified that he had attempted unsuccessfully to alleviate Roussell's amnesia with hypnosis and drug therapy. Roussell's counsel stressed repeatedly to the state trial court that Dr. Scrignar's testimony was not proffered on the issue of guilt or innocence, and acknowledged that the trauma causing Roussell's memory loss could arise from either an accidental or intentional shooting. The psychiatric testimony also was not proffered to prove Roussell's mental state at the time of the killing. As the Louisiana Supreme Court observed in affirming Roussell's conviction, he "only sought to introduce the evidence on the issue of credibility." 424 So.2d at 229. Dr. Scrignar was expressly proffered for the *sole* purpose of *corroborating* Roussell's testimony as to his memory loss. Roussell speculates that his credibility had been damaged by his claim not to be able to remember the events right after the shooting. The theory is that by corroborating Roussell's claim of memory loss, Dr. Scrignar would have bolstered Roussell's general credibility, and thus the jury would have been more likely to believe Roussell's denial of motive or intent to kill his wife.

The state trial court prohibited Roussell from calling Dr. Scrignar. On appeal, the Louisiana Supreme Court affirmed. 424 So.2d at 228–30. Article 651, La.Code Crim.Proc., prohibits evidence of the defendant's "insanity or mental defect at the time of the offense" unless the defendant pleads not guilty by reason of insanity, and

the Louisiana Supreme Court had held in *State v. James*, 241 La. 233, 128 So.2d 21 (1961), that amnesia is a mental defect. In light of article 651 and *James,* the only real question was whether Roussell's amnesia existed "at the time of the offense." Over a dissent by Justice Calogero, joined by Justice Dennis, pointing out that amnesia "is a condition that occurs after the event, not before it or even simultaneously with it," 424 So.2d at 232, the court majority "infer[red] ... that defendant's amnesia as to the shooting began at the time of the offense." 424 So.2d at 230. Therefore, held the court, the exclusion of Dr. Scrignar's testimony was proper under state law.[4] Our role does not permit us to review this interpretation of state law. *Meyer v. Estelle,* 621 F.2d 769, 771 (5th Cir. 1980); *Passman v. Blackburn,* 652 F.2d 559, 568 (5th Cir.1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1722, 72 L.Ed.2d 141 (1982). States have leeway to choose their own rules of evidence, and those rules yield only when they "come[ ] into conflict with a fundamental constitutional right." *Braswell v. Wainwright,* 463 F.2d 1148, 1154 (5th Cir.1972). Thus, we focus only on Roussell's contention that his Sixth and Fourteenth Amendments rights were violated by the exclusion under state law of Dr. Scrignar's testimony.

■ In pertinent part, the Sixth Amendment provides that in all criminal prosecutions the defendant shall "have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. The compulsory process clause is not limited to providing a subpoena power, but extends to the right to present evidence to the fact finder. *Taylor v. Illinois,* —— U.S. ——, 108 S.Ct. 646, 649–51, 98 L.Ed.2d 798 (U.S.1988). In *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the Supreme

---

**4.** This construction of state law plainly came as no surprise to Roussell. More than two months prior to trial, when Roussell was still charged with first degree murder, his counsel had submitted a lengthy memo to the trial court explaining why Roussell was pleading "not guilty and not guilty by reason of insanity." Even though counsel did not believe Roussell was insane, he noted that "if [Roussell] drops his plea of insanity ... he is prevented from putting on testimony regarding his amnesia." When the state dropped the charge to second degree murder, Roussell changed his plea to "not guilty" and thereby knowingly took the risk that the trial court would exclude evidence that Roussell suffered from amnesia. Roussell has not disputed that, when he changed his plea, he was fully aware that this might well result in the very exclusion of evidence of which he now complains.

Court held that this clause prohibits a state from arbitrarily denying a defendant "the right to put on the stand a witness ... whose testimony would have been relevant and material to the defense." 87 S.Ct. at 1925.

■ Like many other constitutional rights, the right to call witnesses is not absolute. *See id.* at 1925 n. 21; *United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982). "[T]he right to present relevant testimony ... 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Rock v. Arkansas*, — U.S. —, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973)). And, "[t]he State's interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement of firm, though not always inflexible, rules relating to the identification and presentation of evidence." *Taylor*, 108 S.Ct. at 653 (footnote omitted). For example, a defendant is not entitled to burden the proceedings with cumulative testimony, *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir.1983); *United States v. Wilson*, 732 F.2d 404, 412 (5th Cir.), *cert. denied*, 469 U.S. 1099, 105 S.Ct. 609, 83 L.Ed.2d 718 (1984); *Passman*, 652 F.2d at 566, and the defendant's right to call witnesses does not overcome a witness' Fifth Amendment privilege against self-incrimination. *E.g., United States v. Khan*, 728 F.2d 676, 678–79 (5th Cir.1984); *United States v. Melchor Moreno*, 536 F.2d 1042, 1046 (5th Cir.1976).

Most obviously, the right to call witnesses is limited to relevant and material testimony. *Washington*, 87 S.Ct. at 1925; *see Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (due process required admission of certain *critical* hearsay testimony); *see also Ashley v. Wainwright*, 639 F.2d 258, 261 (5th Cir.1981) (no Sixth Amendment right to witness who cannot aid the defense); *Melchor Moreno*, 536 F.2d at 1045–46 (district court must have some justification for excluding *material* witness). As *Valenzuela–Bernal* stat-

ed: "In *Washington*, this Court found a violation of this Clause of the Sixth Amendment when the defendant was arbitrarily deprived of 'testimony [that] would have been *relevant* and *material*, and ... *vital* to the defense.' 388 U.S., at 16, 87 S.Ct., at 1922 (emphasis added)." *Valenzuela–Bernal*, 102 S.Ct. at 3446. There, the Court also observed that under Fed.R.Crim.P. 17(b) the government is required to subpoena a witness requested by an indigent defendant *only* upon a showing that the witness' presence "is necessary to an adequate defense." 102 S.Ct. at 3446 n. 7. *See also United States v. Duggan*, 743 F.2d 59, 82 n. 8 (2d Cir.1984) (constitutional right to call witnesses limited to testimony that is "relevant, material and vital to the defense"; preclusion of insanity defense under Fed.R.Crim.P. 12.2(a) held proper absent showing of materiality and vitality of potential defense evidence); *Sharlow v. Israel*, 767 F.2d 373, 376–79 (7th Cir.1985) (stating that Sixth Amendment trumps state evidentiary rules only if evidence is critical, relevant, material, vital, and trustworthy), *cert. denied*, 475 U.S. 1022, 106 S.Ct. 1212, 89 L.Ed.2d 324 (1986).

This latter limitation frames our inquiry in this case. Louisiana law does not bar evidence of a defendant's amnesia, but requires as a condition for its admission a plea of "not guilty by reason of insanity." Whether in a particular case that requirement exacts a price higher than the Sixth Amendment permits depends on the relevance, materiality, and importance of the excluded testimony to the central issues in the trial.

■ In this case, the Sixth Amendment was not offended. Dr. Scrignar's proffered testimony regarding the genuineness of Roussell's amnesia had no direct bearing on the elements of the crime with which Roussell was charged. To prove second degree murder, the state had to show that Roussell committed a homicide with a specific intent to do so. La.Rev.Stat. § 14:30.1; *State v. Tuckson*, 414 So.2d 360, 363 (La.1982); *State v. Williams*, 438 So.2d 1212, 1216–17 (La.App.—3d Cir.), *writ denied* 443 So.2d 590 (1983). Roussell never

disputed that he had shot and killed his wife. The only controverted issue at trial was whether he had intended to do so. As we will show at greater length, Roussell recalled and *testified* about events up to and *including the shot.* He denied having the intent to kill his wife. Dr. Scrignar did not know whether Roussell had intended to shoot his wife. The psychiatrist obviously had not been on the scene and had no direct knowledge whatever of the events in question. Dr. Scrignar would not have testified about Roussell's intent, only about Roussell's amnesia. However, as Roussell concedes, the existence of amnesia is not directly relevant to the question of intent because it is as likely that Roussell was repressing evidence of intent as it is that he was repressing exculpatory recollections. The state did not rely on Roussell's lack of memory to prove its case, and memory loss is not a defense to the crime. The only purpose of Dr. Scrignar's testimony was to bolster Roussell's credibility when he claimed to have lost his memory of *post-shooting* events. On the present record, this testimony was, at best, only remotely connected to the critical issue of intent. It was not so material, relevant and vital as to invoke Sixth Amendment protection.

To prove Roussell's intent, the state introduced an inculpatory statement given to police by Roussell shortly after his arrest, and also presented eyewitness testimony. One eyewitness, Nellie Oubre, testified that shortly before the shooting Dara Ann had pleaded with her not to let Roussell kill her, Dara Ann. After Oubre quieted Dara Ann, she asked Roussell if he had a gun, and he denied having one. Nonetheless, she told Roussell to leave. Then the telephone rang. The victim's mother—Oubre's daughter-in-law—was on the line. Dara Ann spoke to her mother and then gave the phone to Oubre. When their conversation ended, Roussell asked to speak to his mother-in-law, but when he took the phone she had hung up. According to Oubre, Roussell spoke, "That is the best thing you could have done" into the phone receiver, laid it down, and turned and shot his wife. He then turned to David Mitchell and said,

"You're next" and tried to shoot but his pistol jammed and Mitchell wrestled him to the floor.

David Mitchell's testimony was similar. When he arrived at the trailer on the night of the shooting, Dara Ann appeared very upset; she was shaking and had been crying. About the time the phone rang, Mitchell heard Roussell tell the victim "now you have done it" and that she had too many people involved in her business. Mitchell also corroborated Oubre's testimony regarding Roussell's statement into the phone receiver as his mother-in-law hung up. According to Mitchell, after Roussell's mother-in-law hung up, Roussell turned and shot Dara Ann. Roussell next turned to Mitchell and said, "This one's for you" and tried unsuccessfully to fire the gun. Mitchell tackled Roussell and held him until the police arrived.

After police arrived, they gave Roussell his *Miranda* warnings and took him to the sheriff's office where he gave a voluntary statement. Relevant excerpts are as follows:

"Q: In your own words can you tell me what happened tonight and how did Dara get shot?

"A: We were looking for Dara's purse, we were fussing, I had my pistol in my ho[l]ster, I was just about ready to leave when Leatrice [Mitchell] came over, then her husband [David Mitchell] knocked on the door. I looked outside to see what was going on. Her husband was standing outside with a shotgun. Dara was outside on the steps. She said she wanted to catch some air. Leatrice made her husband put the shotgun up.

"Andrew [Oubre] came home and was carr[y]ing on about a gun. He left[,] went to the courthouse[,] picked up Nellie[,] and came home. Then everybody was inside and I still did [n]ot know what was going on. Dara's mama called on the phone and Dara started telling her that I was threat[e]ning her with a gun and all that. I thought that all these phone calls were about the purse being missing. I wanted to talk to Dara's mama on the phone. When Dara's

gra[nd]ma gave me the phone her mama had hung up. Everybody was crowding me. *All I remember was I fired the gun* and someone was in my way to the door. This one in my way was the one that had the shotgun e[a]rlier. The gun was jammed and I thought he was going to go get the shotgun. Then all I remember was that guy was on me and I gave him the gun. Someone was yelling hit him in the head, hit him in the head.

"Q Do you remember what made you shoot Dara?

"A: *Nothing more than pulling the trigger.*

"Q: Did you point the gun at her before pulling the trigger?

"A: *The last thing I remember is the gun being fired and him (D. Mitchell) running towards the door. Then him being on top of me* and the cops coming.

"Q: Where was the gun when you fired it?

"A: In my jacket pocket.

"Q: How long have you and Dara been married?

"A: 4 months.

"Q: Did you at any time try to shoot David Mitchell the man that was running towards the door that you thought was going to get his shotgun?

"A: I did not try to shoot him.

"Q: Mr. Roussell would you like to add anything to this statement?

"A: Just about it.

"(Signed) Roland Roussell Jr." (Emphasis added.) [5]

As summarized, the state's evidence strongly suggested that Roussell had intended to kill his wife. To counter the state's case, Roussell took the stand. Roussell testified about the events leading to the shooting, and he remembered the shot; he claimed memory loss only of events in a brief interval of time *after* the shooting. This is important because if Roussell had claimed not to remember the shooting itself, we think it more likely that the jury would have been suspicious and might have viewed such memory loss as a convenient excuse on his part to avoid testifying about the crucial issue, the actual shooting. The jury might then have assumed Roussell was hiding something. In that situation, expert corroboration of the claimed amnesia *might* be more meaningfully relevant and material, despite the fact that such corroboration would still go only to a subsidiary question—amnesia—rather than to an element of the crime—intent. Here, however, because Roussell was able to testify regarding the offense itself, the corroboration of his memory loss *after the shooting* was not, under all the facts here, so material that the Sixth Amendment required its admission notwithstanding the recognized prohibition arising from Louisiana pleading requirements. Following are the relevant portions of Roussell's testimony:

5. On direct examination at trial, Roussell was asked about this statement:
"Q Describe to the jury how the statement was taken....
"A The first few questions on the statement which was my name and why was I at the house was asked in question and answer form and then he asked me if I could explain what took place and I told him the whole story just like I am telling it now and he would type afterwards. He didn't type as I was telling the story.
"Q How long did this whole process take, to the best of your recollection?
"A A little over an hour.
"....
"Q Now when your statement was finished, did you sign it?
"A Yes sir.
"Q I am going to show you what has been marked for identification as State's Exhibit 11 and ask you if that is the statement that you gave?
"A This is the statement.
"Q Is that your signature on it?
"A Yes sir.
"Q Did you read it prior to your signing it?
"A I briefed over it.
"Q Did it appear to you to be correct and accurate?
"A Yes, it did because the main part I read up in the statement was the last part where he asked me what made me—do you remember what made you shoot your wife. And, *I told him the last thing that I remember was a shot being fired and this guy being on the floor choking me* and that was it. I couldn't tell him anymore because *I didn't remember any more.*" (Emphasis added.)
At trial, Roussell denied ever having made the incriminating remarks in this signed statement.

*Direct Examination*

"Q The question I had asked you Mr. Roussell was how did you feel at ... the time that you just got off the phone attempting to talk to Dara Ann's mother?

"A I was nervous, disappointed really and mostly nervous—just mostly nervous.

"Q What was making you nervous?

"A The scene around me. The fact that my wife saying that I was going to shoot her and I knew it wasn't true. I just didn't believe what was happening.

"....

"Q Then, after getting off the phone, what did you do?

"A I walked toward the table to get my bag that I had some clothes in so I could leave.

"....

"Q Where were you going to go?

"A I was planning on coming back home.

"....

"Q ... What is the next thing that you remember, Mr. Roussel?

"A Well, Mrs. Oubre was still trying to talk to Dara Ann and [find] out what was going on and I had made it to the table to get the bag and I was wanting to talk to her Nellie before I left the house—

"Q Nellie, that is Mrs. Oubre.

"A Mrs. Oubre and Mrs. Oubre was still trying to calm Dara Ann down and during that time *that is when the shot was fired.*

"Q Do you remember the shot?

"A *I remember the shot.*

"Q Do you know how the shot came about and—I mean what cause[d] there to be a shot?

"A I didn't know at that time.

"Q You heard testimony since that as to what happened, correct?

"A Yes, I did.

"Q *But do you recall causing, doing anything to cause the shot?*

"A *From that time.*

"Q That is correct.

"A *Yes, I do.*

"Q What do you recall?

"A *I had the pistol in the palm of my hand and I was squeezing down on the body of the pistol in my jacket pocket.*

"Q I am going to show you what has been marked for identification as State 1 [the gun] and ask you to stand up and demonstrate for the jury how the gun was in your hand. Let the record reflect that the witness has his hand around the entire gun with the small finger toward the butt of the gun, the thumb and the forefinger near the end of the barrel.

"....

"Q *Did you ever do anything purposely to make that gun fire?*

"A *No sir, I didn't.*

"Q Did you ever do anything to aim that gun in anyone's direction?

"A No sir.

"Q In preparation of the firing?

"A No sir.

"Q *Did you have any intention of shooting anyone?*

"A *No sir, I didn't.*

"Q Did you have any—you mentioned that you were upset before this happened, but did any of that make you want to harm or hurt Dara Ann?

"A No sir, the only thing I wanted to do was try to explain to Nellie that I didn't tell her anything and leave the house.

"Q What is the next thing you remembered?

"A The next thing I remembered is David Mitchell on the floor choking me and I was trying to get the gun out of my pocket at that point while he was choking me.

"Q Why did you want to get the gun out then?

"A To defend myself. I didn't know why he was choking me and I was trying to get the gun out of my pocket to try and defend myself.

"....

"Q Now, from the time that this event took place, up until today, have you made an effort to remember what took place *from the time that shot was fired up*

*until the time you remember being choked?*

"A   Yes sir, I have."   (Emphasis added.)

*Cross-examination*

"Q   Who handed you the phone?

"A   Nellie.

"Q   And when you picked up the phone you heard it being hung up on the other end?

"A   Yes sir.

"Q   Then it is your testimony that you walked toward the table, is that correct?

"A   Yes sir.

"Q   To pick up a bag of your belongings?

"A   I didn't pick the bag up.

"Q   Oh, you didn't pick up the bag?

"A   No sir.

"Q   You walked towards the table then?

"A   To get the bag.

"Q   *And then the gun went off?*

"A   *Well, that's when the explosion happened or when the gun shot happened when I got to the table.*

"Q   *Now, you had your hand on the gun at that time, correct?*

"A   *Yes sir.*

"Q   How long before the explosion or the gun shot had you had you[r] hand on that gun?

"A   I had my hand in the pocket all the time and my hand had been on the gun since we had come from outside in the yard and I took it out of my belt and I put it in my pocket and my hand stayed in that pocket.

" . . . .

"Q   And then *once* the explosion went off—*the gun shot the next thing you remember is David Mitchell being on top of you?*

"A   *Yes sir.*

" . . . .

"Q   Now, let me get this straight. When you got off the phone, you went towards the table with your hand on the gun, correct?

"A   With my hand wrapped around the gun.

"Q   Wrapped around the gun.   *You walked toward the table and a gun shot went off, correct?*

"A   *Yes sir.*

"Q   *And then you blacked out,* you don't remember anything?

"A   That's all I remember."   (Emphasis added.)

Clearly, Roussell was able to remember the shooting, and to deny having the intent to kill.   By his testimony, he heard the shot and did not at the time know its source, though he was gripping the gun tightly. Dr. Scrignar's testimony about Roussell's memory loss *following* the shooting would have had no direct bearing on the offense itself.

Not only did Roussell remember the shooting, but during cross-examination he denied several of Mitchell's statements about what had happened right after the shooting—during the period of time that Roussell previously had claimed not to be able to remember.

"Q   Now, *you don't remember* pointing the gun at David Mitchell, do you?

"A   No sir, *I didn't.*

"Q   *Do you remember* pulling the gun out and pointing it at David Mitchell and saying 'You're next'?

"A   No sir, *I didn't tell him that.*

"Q   You didn't tell him that?

"A   I never pulled the gun out on David Mitchell.

"Q   You remember that you never pulled the gun out?

"A   That is right.

" . . . .

"Q   You heard David Mitchell's testimony.   Did you not?

"A   Yes, I did.

"Q   And he testified that right after the shot, you turned to him, pointed the gun at him, tried to shoot him and said, '[Y]ou're next, m.f.' as I recall.   Do you recall that testimony?

"A   Yes sir, I do.

"Q   *You didn't do that?*

"A   No sir, *I didn't.*

"Q   Are you sure?

"A   Yes sir.

"Q  And then you heard him testify that he pulled that gun out—that you pulled that gun out, stuck it at him and tried to shoot him. *You didn't do that?*

"A  *No sir, I didn't.*

"Q  *You remember that?*

"A  *Yes sir.*

"Q  You are positive that you didn't do that?

"A  Yes sir, I am." (Emphasis added.)

In light of Roussell's earlier claimed amnesia regarding this interval of time, the prosecutor evinced skepticism of Roussell's denials. However, this was a risk that Roussell took by simultaneously claiming memory loss and disputing Mitchell's testimony. Interestingly, the most Dr. Scrignar could have done for Roussell's case was to testify that Roussell could not remember the events *after* the shooting. But if the jury had believed Dr. Scrignar, it would have had to believe that Roussell had fabricated his absolute denial of Mitchell's testimony. Given this, it is difficult to believe that Dr. Scrignar's testimony would have bolstered Roussell's credibility.

■  "The right to offer the testimony of witnesses ... is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington,* 87 S.Ct. at 1923. Roussell's Sixth Amendment rights were not violated because he was able to present his defense. He testified fully and from his own memory about every event having a bearing on the elements of the offense. In this case, the Louisiana rule that excluded Dr. Scrignar's testimony unless Roussell claimed insanity as a defense did not exact an unconstitutional price.[6] Because of our holding that

6.  Contrary to Roussell's representations, the record does not reveal any significant emphasis by the state on Roussell's claimed memory loss. The only "attacks" on Roussell's credibility occurred when the prosecutor cross-examined him regarding inconsistencies between the statement he gave police just after his arrest, his testimony on direct examination regarding memory loss, and his testimony on cross-examination in which he claimed to remember the moments just after the shooting. This cross-examination reveals skepticism of Roussell's disclaimers of his post-arrest statement and of his denials of Mitchell's testimony, but we do not read it as an attack on Roussell's claim of memory loss.

In closing argument, the prosecutor referred three times to Roussell's claimed memory loss. He pointed out the inconsistency between Roussell's claim of memory loss, and his absolute disagreement with Mitchell's version of post-shooting events. The prosecutor also stated, "Mr. Roussell says, I don't remember. I don't remember what happened. Possibly it is convenient for Mr. Roussell, maybe amnesia. But we don't need for him to remember what happened. Even if what he says is true, we don't need him to remember. The facts are there." Later, the prosecutor commented, "There is no doubt. This man murdered his wife. And, if he says he doesn't remember it, fine. But the memories of what happened that night will live with [the prosecutor lists the witnesses]."

So far as the record reflects, Roussell's alleged loss of memory was simply not a significant issue at trial.

Apart from questioning Roussell about the shooting and surrounding events, and his pre-trial statement on those matters, the prosecutor put on no evidence that Roussell did not have the lack of memory he claimed. Never during the trial did the prosecutor state, suggest, or imply that Roussell was lying about his loss of memory, and therefore must be lying about his lack of intent. Even if the prosecutor had done so, Roussell would normally not have acquired the right to bolster his credibility, at least not in a federal court. Fed.R.Evid. 608; *see United States v. Thomas,* 768 F.2d 611, 618 (5th Cir. 1985); *United States v. Danehy,* 680 F.2d 1311, 1314 (11th Cir.1982); *United States v. Jackson,* 588 F.2d 1046, 1055 (5th Cir.), cert. denied, 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979); *Kauz v. United States,* 188 F.2d 9, 10 (5th Cir. 1951). These cases teach that a defendant does not create the right to bolster merely by taking the stand, nor is the right to bolster created by vigorous cross-examination or contradictory evidence in the case. Louisiana's analogous rule of evidence is La.Rev.Stat. § 15:485; *see also State v. Landry,* 359 So.2d 99, 104 (La.1978) (corroboration of defendant's believability admissible only after credibility has been attacked); *State v. Williams,* 331 So.2d 467, 469 n. 2 (La.1976) (same).

However, if Dr. Scrignar's testimony would have been material, we could not uphold its exclusion on grounds that Roussell's credibility was not attacked. Dr. Scrignar would not have given general testimony regarding Roussell's credibility, but would have testified from personal knowledge that a specific claim by Roussell was true. Evidence regarding a material fact in the case is admissible, even if that evidence corroborates some witness' testimony, and thus at least indirectly bolsters that witness' credibility. *Cf. Osborne v. United States,* 542 F.2d 1015, 1019 (8th Cir.1976) (Rule 608(b) does

the Sixth Amendment did not require the admission of Dr. Scrigner's testimony, we need not reach the question of harmless error. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[7]

## II. Illegal Sentence

A few weeks after the jury convicted Roussell of manslaughter, the state trial court conducted a sentencing hearing. The trial court evaluated the fourteen sentencing guidelines codified in La.Code Crim. Proc. art. 894.1. One of these guidelines states that the court should impose imprisonment if "[a] lesser sentence will deprecate the seriousness of the defendant's crime." Art. 894.1(A)(3). In connection with its consideration of this particular guideline, the court made the following comments, which, according to Roussell, demonstrate that in assessing sentence the court unconstitutionally relied on its opinion that Roussell was guilty of second degree murder, contrary to the jury's verdict:

"Here we have a case where a defendant was charged originally with one of the highest charges that you can be charged with and the State prosecuted on the second degree murder. *The jury playing Judge decided that this was not second degree murder and the jury giving him a break decided it was going to be manslaughter. When the facts indicate that the defendant should be guilty of second degree murder, all the facts fit within second.* So, the jury undertook a position that actually juries are supposed to convict not to sentence people. *They decided that they were going to convict him and they came up with this particular conclusion and, of course, under the law this [manslaughter] is a responsive verdict and this is their realm where they found it....*

"This court looks at the entire matter and at this particular time has considered this and has also indicated and looked at the presentencing investigation which this court does not find itself in agreement with. This court finds that the probation officer, in this particular case,

not exclude alibi evidence because that has a "material bearing upon the crime at issue"); *United States v. Alexander,* 816 F.2d 164, 166–69 (5th Cir.1987) (district court erred in excluding corroborating evidence of defense of mistaken identity; Rule 608 not discussed); *United States v. Opager,* 589 F.2d 799, 801–02 (5th Cir.1979) (evidence of material fact not excluded by Rule 608(b) even though it has incidental effect of proving a witness a liar). Analogy may be made to the rule prohibiting impeachment by contradiction on a "collateral" matter. A matter is not "collateral" for this purpose if it is relevant independent of the contradiction, McCormick, *Evidence* § 47 at 110–11 (3d Ed.1984), *or* if it constitutes a "contradiction of any part of the witness's account of the background and circumstances of a material transaction, which as a matter of human experience he would not have been mistaken about if his story were true." *Id.* at 112. However, in the application of this latter principle, "a reasonable latitude of discretionary judgment must be accorded to the trial judge." *Id.* In a similar vein, the same authority says respecting witness rehabilitation: "Credibility is a side issue and the circle of relevancy in this context may well be drawn narrowly. How narrowly is a question of degree as to which reasonable courts differ." *Id.,* § 49 at 116.

**7.** Roussell asserts his claim under the Fourteenth Amendment's due process clause, as well

as the Sixth Amendment. He has not suggested that a separate, more stringent review is required under the Fourteenth Amendment. Indeed, his brief asserts that the two provisions are "overlapping" in this context. His citation of the Fourteenth Amendment seems to be no more than a reflection of the Supreme Court's holding in *Washington* that this Sixth Amendment clause is incorporated within the Fourteenth Amendment's due process clause. 87 S.Ct. at 1922–23. At any rate, we do not believe that the general protection of due process provides Roussell any greater rights in this context than the more specific Sixth Amendment guarantee to call witnesses and present their testimony. *Cf. Valenzuela-Bernal,* 102 S.Ct. at 3449 (Fifth Amendment due process clause provides no greater protection than Sixth Amendment right to call witnesses); *Webb v. Texas,* 409 U.S. 95 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (suggesting, by its treatment under the Fourteenth Amendment of claim that trial court intimidated witness, that Sixth and Fourteenth Amendments analyses in this context are the same); *Sharlow,* 767 F.2d at 377 (applying *Chambers v. Mississippi,* 410 U.S. 284 93 S.Ct. 1038, 35 L.Ed. 2d 297 (1973), due process analysis to Sixth Amendment compulsory process claim). Accordingly, our rejection of Roussell's Sixth Amendment claim has the concomitant effect of rejecting any separate Fourteenth Amendment claim he may be raising in respect to the exclusion of Dr. Scrigner's testimony.

sought [*sic*] of looked at one side and didn't check the other side; the total side; the side of society. The side of what is happening right now on the street with people who are being killed. People who are fighting, husband and wives who are fighting; people who are being abused and people who are being pushed around. The newspaper reeks of this type of thing. And, of course, the system of justice it places it upon the Judge to place this particular type of situation and see just exactly what is going to be done. The presentencing investigation of which I have a copy indicates the number of letters and, I guess, I could get just as many letters by writing to all of those friends of the victim as I could by writing to the friends of the defendant. I have read the letters. I have looked at them and I have tried in many ways to follow and go along with some of the recommendations of the probation officer and actually, to a certain extent, his recommendation would almost indicate that a suspended sentence would be given in reference to this particular type of crime. *Here we have a person who is charged with second degree murder which, should be second, which is not second but which the jury, as I said, made this decision and which we come up with a consideration.*

"I understand what you [defense counsel] have said, sir. I understand all of the problems that you have indicated for the defendant and, of course, it reaches a time in society in which we have to do whatever has to be done." (Emphasis added.)

The court then proceeded to sentence Roussell to the maximum term for manslaughter, twenty-one years, plus two more years for using a firearm, stating, "[I]t is the sentence of this court, Mr. Roussel [*sic*], that you be sentence[d] to the Department of Corrections for a period of 21 years *for manslaughter*, [with] credit for time served.... [A]nd in accordance with Article [14:]95.2 [*see* note 3, *supra*] ... an additional term ... for a period of two years under 95.2...." (Emphasis added.)

We hold that Roussell has not established a constitutional violation. The Constitution permits the sentencing authority to consider a wide range of matters in assessing sentence. For example, the court may consider the defendant's failure to cooperate with the government, *Roberts v. United States*, 445 U.S. 552, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980), as well as the defendant's demeanor at trial, *United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 2615, 57 L.Ed.2d 582 (1978); *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 1085, 93 L.Ed. 1337 (1949). If the court is convinced that the defendant has perjured himself at trial, that is a valid consideration, even though the defendant has not been convicted of perjury. *Grayson*, 98 S.Ct. at 2617–8. "Even *facts* disclosed during the course of a prior trial which ended in an acquittal or was reversed on appeal can be considered by the Court." *United States v. Bowdach*, 561 F.2d 1160, 1175 (5th Cir.1977) (emphasis in original); *see also Grayson*, 98 S.Ct. at 2615 ("sentencing authority may legitimately consider the evidence heard at trial"); *United States v. Sweig*, 454 F.2d 181 (2d Cir.1972); *United States v. Bernard*, 757 F.2d 1439 (4th Cir.1985). Other valid factors include "evidence of crimes for which the defendant has been indicted but not convicted," *United States v. Ochoa*, 659 F.2d 547, 549 (5th Cir.1981), *cert. denied*, 455 U.S. 959, 102 S.Ct. 1472, 71 L.Ed. 2d 678 (1982), evidence underlying dismissed counts, *United States v. Martinez*, 584 F.2d 749, 750 (5th Cir.1978), and, in some circumstances, the fact that in allowing the defendant to plead guilty the government has agreed not to bring additional charges, *United States v. Tooker*, 747 F.2d 975, 980 n. 7 (5th Cir.1984), *cert. denied*, 471 U.S. 1021, 105 S.Ct. 2032, 85 L.Ed.2d 314 (1985); *compare United States v. Baylin*, 696 F.2d 1030, 1039 (3d Cir.1982) (holding that court erred in assuming that prosecutor's decision to drop some charges as part of a plea bargain meant there was evidence of defendant's complicity in those dropped charges). By considering such a range of matters, the sentencing authority can more nearly tailor

the sentence to the offender as well as the crime. *See generally Williams*, 69 S.Ct. at 1082–85.

■ Naturally, this sentence-tailoring purpose is not served if the sentencing authority relies on incorrect or unsupported assumptions and, therefore, when such reliance is manifest in the record due process requires that the defendant be resentenced. For example, a court may not consider constitutionally invalid *convictions* in assessing sentence. *United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972); *Townsend v. Burke*, 334 U.S. 736, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (court cannot rely on assumed convictions that, in fact, did not exist); *McAffee v. Procunier*, 761 F.2d 1124, 1126 (5th Cir.) (court cannot rely on criminal record for which there is no record evidence), *cert. denied*, 474 U.S. 907, 106 S.Ct. 237, 88 L.Ed.2d 238 (1985). It is improper to rely on an assumption about the evidence that is unsupported by the record. *United States v. Tobias*, 662 F.2d 381, 388 (5th Cir.1981) (no support for assumption that defendant procured narcotics ingredients on a massive scale), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982). A court may base a sentence on its *own* perception of the role a defendant played in a conspiracy, but it may not base a sentence on the unsupported assumption about what the *jury* found. *United States v. Vasquez*, 638 F.2d 507, 534 (2d Cir.1980), *cert. denied*, 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620, 454 U.S. 847, 975, 102 S.Ct. 165, 528, 70 L.Ed.2d 135, 396 (1981).

■ In this case, the court clearly believed that a second degree murder verdict would have been truer to the evidence than the manslaughter verdict which the jury returned. But the court did not incorrectly assume that the jury actually had convicted Roussell of second degree murder—the court was well aware that Roussell stood convicted only of manslaughter and could be sentenced only for that offense. Unlike the situation in *Tucker, Townsend,* and similar cases, the sentence was not based on a nonexistent or constitutionally invalid conviction. However, in deciding what sentence would fit this offender, the court could not realistically be expected to expunge from its mind the evidence presented at trial. *See United States v. Campbell*, 684 F.2d 141, 154 (D.C.Cir.1982). We read the court's comments as indicating its view that Roussell's crime was as serious a manslaughter as could be imagined, and that any sentence short of the maximum *for manslaughter* would deprecate the gravity of Roussell's act. The court did not violate the Constitution in "acknowledging the impact of the evidence presented during the trial," *Campbell*, 684 F.2d at 184, because it did not incorrectly assume that Roussell had been convicted of, or could be sentenced for, second degree murder. *See United States v. Bernard*, 757 F.2d 1439 (4th Cir.1985) (sentencing court did not violate due process in considering evidence that defendant intended to distribute marihuana, even though jury had convicted on the lesser included offense of possession). *Cf. McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) (sentencing facts, though related to manner in which the offense was committed, need not be determined by jury or proved beyond a reasonable doubt or even by clear and convincing evidence); *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) (not guilty verdict on one count does not establish any evidentiary predicate to vitiate guilty verdict on another count in the same trial).

### Conclusion

We affirm the district court's denial of Roussell's petition for the writ of habeas corpus. The testimony of Dr. Scrignar was not excluded in violation of the Sixth or Fourteenth Amendments, and the state trial court did not rely on incorrect or unsupported assumptions in assessing sentence.

AFFIRMED.