**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Gerald VONTSTEEN,
Defendant–Appellant.**

No. 88–2331.

United States Court of Appeals,
Fifth Circuit.

April 28, 1989.

---

H. Michael Sokolow, Asst. Federal Public Defender, Roland E. Dahlin, Fed. Public Defender, Houston, Tex., for defendant-appellant.

Paula M. Offenhauser, Asst. U.S. Atty., Henry Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before GARWOOD, JONES, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In this case, we must determine whether invoices mailed by defrauded sellers to the perpetrator of a fraud can constitute a sufficient jurisdictional basis for a federal mail fraud prosecution without additional, specific proof of how the invoices advanced, or were integral to, the scheme to defraud. Concluding that under the specific facts of this case there is no such jurisdictional basis, we reverse defendant's conviction for mail fraud but affirm his conviction for interstate transportation of stolen property.

## I. *Facts.*

Defendant Gerald Vontsteen was convicted on twenty-one counts of aiding and abetting mail fraud in violation of 18 U.S.C. §§ 1341 and 1342 and on one count of transporting stolen property in interstate commerce in violation of 18 U.S.C. § 2314. This criminal conduct occurred over several months (late fall 1982 through summer 1983), during which Vontsteen ran operations buying and selling oilfield pipe for AMRO, Inc. ("AMRO"), a company owned by Leslie Ross Malden.[1] The scheme oper-

---

1. Malden was indicted with Vontsteen on counts 12–22, and on an additional count 23 for mak-

ated by means of AMRO's buying pipe on credit during a down period in the market, short-selling it, presumably pocketing the profits, and then refusing to pay the suppliers. The jurisdictional basis for the mail fraud convictions was the mailing of invoices to AMRO by the defrauded pipe suppliers. None of the invoices so charged in the indictment was ever paid.

On appeal, as to the mail fraud convictions, defendant maintains that these mailings were not in furtherance of the fraud as is required as a matter of law; that the evidence was insufficient to convict; that he was denied his sixth amendment right to confront a hostile witness; and that the jury charge impermissibly amended the indictment. As to the conviction for interstate transportation of stolen property, he argues the same confrontation clause point as well as the insufficiency of the evidence. He also asserts that the trial judge considered improper information in sentencing him. We now reverse the mail fraud conviction, affirm the stolen property conviction, and remand for resentencing based upon our reversal of 21 of the 22 counts. Because we base our reversal of the mail fraud convictions upon our conclusion that the invoices did not constitute an adequate jurisdictional basis, we do not address the other issues raised by defendant with respect to these convictions.

## II. *Mail Fraud.*

 In order to convict for mail fraud under 18 U.S.C. § 1341, the government must prove, *inter alia,* that the mails were used in furtherance of the scheme to defraud. That is, the United States must establish that the mailing was " 'for the purpose' of executing the scheme." *United States v. McClelland,* 868 F.2d 704, 707 (5th Cir.1989). This element of mail fraud is the basis for federal criminal jurisdiction.[2] In the instant case, defendant was convicted on twenty-two counts of aiding or abetting mail fraud based upon his taking or receiving, or causing to be taken or received, from the mail the invoices for the fraudulently-obtained pipe. He argues that, as a matter of law, the mailing of these invoices did not advance any scheme to defraud, were not "integral" to any such scheme, and consequently could not support his mail fraud convictions. We agree with this analysis; accordingly, we reverse the convictions on the mail fraud counts.

In *Parr v. United States,* 363 U.S. 370, 392–93, 80 S.Ct. 1171, 1184–85, 4 L.Ed.2d 1277 (1960), the Supreme Court held that the scheme to defraud underlying school board officials' personal use of the school district's credit card came to fruition upon the officials' receipt of the individual goods and services purchased with this credit. The subsequent billing of the school district via the mail occurred after the scheme was completed and was immaterial to the fraud.

Similarly, in *United States v. Maze,* 414 U.S. 395, 402–05, 94 S.Ct. 645, 649–51, 38 L.Ed.2d 603 (1974), the Court held that the fraudulent use of a stolen credit card to pay a hotel bill ended when the defendant checked out. Therefore, the subsequent mailings of invoices by the hotel owners and the credit card company could not support a mail fraud prosecution.[3]

---

ing a materially false statement on a loan application. However, he fled the country prior to trial.

**2.** In *United States v. Kent,* 608 F.2d 542 (5th Cir.1979), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980), we stated our jurisdictional test as follows:

> The requisite statutory purpose exists if the alleged scheme's completion could be found to have been dependent in some way upon the information and documents passed through the mails.... and if the use of the mails was 'an integral part of the scheme to defraud.' ... This test of dependence does not demand

that the use of the mails rather than of a private messenger or other means was itself essential to the fraudulent scheme or that 'the success of the scheme actually depended on the mailings in a "but for" sense.' It instead requires that the thing mailed was an integral part of execution of the scheme so that the use of the mails was in this way 'incident to an essential part of the scheme.' [Citations omitted.]

**3.** Subsequent cases had read *Maze* also to stand for the proposition that any use of the mails that tends to defeat the scheme to defraud by encouraging detection cannot constitute the jurisdictional basis for mail fraud. *E.g., United*

Although the facts of the instant case do not fall squarely under *Parr* or *Maze* because of the existence of a broader scheme to defraud, we nevertheless conclude that they cannot be meaningfully distinguished to the extent of justifying a different result. Here, as in those cases, the defendant used credit to obtain goods or services fraudulently. The mailing of invoices to AMRO by defrauded sellers of pipe in each case occurred after the pipe was already shipped and the credit and payment terms were fixed. The details of the scheme would have been exactly the same even without the mailings. It may be true that the extensions of credit were integral to the scheme, but the credit terms were finalized independent of, and prior to, the mailing of the invoices.

The government argues that *Schmuck* is to the contrary. There, the Court held that the mailing of automobile title application forms by defrauded car dealers was in furtherance of a scheme to defraud because the success of "Schmuck's venture depended upon his continued harmonious relations with and good reputation among retail dealers, which in turn required the smooth flow of cars from the dealers to their ... customers" facilitated by the mailings of the title applications. The government emphasizes that in *Schmuck* the Court gave special consideration to the broad scope of the scheme to defraud, and argues that the overall scheme in this case, involving multiple suppliers of pipe, is analogous.

This argument has some logical appeal; however, there is no evidentiary basis upon which it can be sustained. If the government had proved that the invoices were legally operative documents, embodying the terms of the sales, and the mailings of which sealed the extensions of credit upon which defendant's scheme depended, a different result might be required. Unfortu-

nately for its case, however, the government offered no such proof.

Likewise, if it could be shown that certain invoices were paid so that AMRO could develop a deceptively good credit history and procure more pipe on this basis, then perhaps the mailing of those particular invoices would have satisfied the jurisdictional requirement. However, none of the invoices charged in the indictment was ever paid, so such an argument cannot be made.

Given the state of the evidence, we are forced to conclude that this case fits squarely within *Schmuck*'s reading of *Parr* and *Maze*, i.e., that the invoice mailings here "involved little more than post-fraud accounting among the potential victims of the ... scheme[ ]...." *Schmuck*, —— U.S. at ——, 109 S.Ct. at 1449. Accordingly, defendant's convictions on the twenty-one counts of mail fraud must be reversed.

We emphasize that our holding today does not preclude the possibility that the mailing of invoices by a defrauded seller can in some cases provide an adequate jurisdictional basis for a mail fraud conviction. We do, however, require that the government convincingly demonstrate how such mailings advanced or were integral to the fraud. The jurisdictional component of a federal criminal offense is an important element of the government's case in any such prosecution that should not be assumed by the courts; the same is not established in the case of mail fraud simply because a victim of the fraud (or a third party) has mailed a related document after the fact.[4]

### III. *Interstate Transportation of Stolen Property.*

■ Defendant was convicted under count 22 for violating the National Stolen

---

States v. Bonansinga, 773 F.2d 166 (7th Cir. 1985), *cert. denied*, 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986). Very recently, in *Schmuck v. United States*, —— U.S. ——, ——, 109 S.Ct. 1443, 1449–50, 103 L.Ed.2d 734 (1989), the Supreme Court unequivocally rejected this view, holding that "[t]he relevant question at all times is whether the mailing is part of the execution of the scheme to defraud as conceived by the perpetrator at the time, regardless of

whether the mailings later, through hindsight, may prove to have been counterproductive and return to haunt the perpetrator of the fraud."

**4.** Thus, the instant scheme appears to constitute little more than an "obvious run-of-the-mill [local] crime case" that unfortunately was brought in federal, rather than state, court. *McClelland*, 868 F.2d at 710 (Brown, J., concurring in part and dissenting in part).

Property Act, 18 U.S.C. § 2314. In order to convict under this statute, the government must prove (1) the interstate transportation of (2) goods valued at $5.000 or more (3) with the knowledge that such goods have been stolen, converted, or taken by fraud. *Dowling v. United States*, 473 U.S. 207, 214, 105 S.Ct. 3127, 3131, 87 L.Ed. 2d 152 (1985); *United States v. Lennon*, 814 F.2d 185, 187 (5th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 295, 98 L.Ed.2d 254 (1987). In cases of fraudulently-obtained goods, such as the instant case, the government must establish defendant's knowledge that the goods were procured by fraud, although it need not prove the knowledge or foreseeability that such goods crossed state lines. *United States v. Graves*, 669 F.2d 964, 971 (5th Cir.1982). Defendant contends that the evidence was insufficient to convict him under this statute. We reject this argument.

█ In reviewing sufficiency-of-the-evidence claims, we determine whether a reasonable juror could have found the evidence, viewed in the light most favorable to the prosecution, sufficient beyond a reasonable doubt to support conviction. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Rico Indus., Inc.*, 854 F.2d 710, 712 (5th Cir.1988). Applying this standard to the facts before us, we have little trouble concluding that a juror so could have found.

Defendant's conviction under section 2314 was based upon the shipment of three truckloads of pipe obtained from Mustang Supply Company ("Mustang") from Houston, Texas, to Oil City, Louisiana, via Ranger Trucklines. There is no question that the government directly proved that pipe exceeding $5,000 in value was shipped from Texas to Louisiana, thereby satisfying the first two elements of section 2314. It remains for us only to ascertain whether there was adequate proof that the pipe was fraudulently obtained, that defendant knew this, and that he was sufficiently involved in the transaction.

In the course of establishing its mail fraud case with respect to the pipe obtained from Mustang (counts 16–21), the government offered evidence that in late May 1983, defendant presented himself to Mustang's representatives as executive vice-president of AMRO and asked to purchase "truckload" quantities of oil-field tubing and casing, goods normally sold by the foot. Defendant represented that he and his partner were involved in drilling programs, a representation that was instrumental in Mustang's decision to extend credit to AMRO because it signified a large attendant drilling budget. Had defendant disclosed that AMRO was merely "turning around" the sale, credit would not have been extended, as smaller suppliers typically do not have enough qualified salesmen to operate such a business at a profit and in general would have no legitimate reasons for making such purchases. Defendant further represented that AMRO had an operative, John Gartman, in Oklahoma City who would be doing most of the purchasing. The type of pipe ordered was commonly used for drilling in that area, and this representation therefore lent legitimacy to defendant's story.

On the basis of banking and trade credit references, Mustang agreed to supply pipe to AMRO on thirty to thirty-three days' credit and extended a $200,000 line of credit that was increased midway through the purchase period. Between May 27, 1983, and June 22, 1983, Mustang shipped AMRO forty truckloads of pipe totaling over $489,-000 in value. Among these purchases were the three truckloads, shipped at AMRO's request to C.I. Morris in Oil City, that formed the basis of defendant's section 2314 conviction. That pipe had been consigned by Bronc's Pipe Yard to Mustang and was released through Mustang to AMRO pursuant to the unpaid purchases. The invoices for all sales were mailed to defendant.

In late June 1983, Mustang was offered some of its pipe back at a price below the purchase price. Mustang's president then confronted both Gartman and defendant. Defendant assured him that the incident was isolated and that "overall" AMRO was making money on other ventures. He de-

nied the accusation that AMRO was selling its pipe for less than it had bought it. Nevertheless, in the end, none of Mustang's invoices was ever paid, and none of the pipe shipped to AMRO could be located after the company was forced into bankruptcy in late August 1983.

From the above facts, a reasonable juror certainly could have concluded that AMRO procured the pipe sent to Louisiana without intending to pay for it and, hence, that the goods were fraudulently obtained, so as to satisfy this element of section 2314.[5] It was also perfectly reasonable to conclude that defendant was aware that this pipe was fraudulently obtained, so as to meet the *mens rea* requirement.[6]

As to defendant's connection to the shipments, the record shows that either he, or Gartman acting on his instructions, arranged for Ranger to transport the pipe. As noted above, defendant had apprised Mustang that Gartman would be acting on his behalf in making most of the purchases. Accordingly, a rational trier of fact reasonably could infer that defendant was responsible for the transactions that violated section 2314.[7] Accordingly, as there was more than adequate proof to satisfy every requirement of section 2314, defendant's evidentiary argument is without merit.

### IV. *Right of Cross–Examination.*

■ Samos Niamet, AMRO's bookkeeper, testified that he was a legal resident alien.[8] On cross-examination, defendant opened a line of questioning as to Niamet's knowledge that he could be deported if convicted of a felonious offense involving moral turpitude. The trial judge sustained the government's objection to this questioning based upon the fact that Niamet had not been charged with any such offense. Defendant now contends that this restriction denied him the right effectively to confront an adverse witness as to his motivations for testifying.

This argument is without merit. The sixth amendment right to confront witnesses requires that defendants be given the opportunity "to expose to the jury the facts from which jurors, as the sole finders of fact and credibility, could *appropriately* draw inferences relating to the reliability of the witnesses." *United States v. Fortna,* 796 F.2d 724, 734 (5th Cir.1986) (emphasis added).

In this case, adequate opportunity was provided. Since there was no evidence that Niamet had ever been convicted of any offense, or that he would be charged with one, his knowledge about deportation was irrelevant to exploring his motivations in testifying. Defendant was simply checked by an alert prosecutor and a fair judge in his attempt falsely to create an impression of coerced testimony. This is not the equivalent of denying him the right to cross-examine a witness as to his motivations.

The proper line of questioning was whether the government had made any sort of deal with Niamet by way of threats or promises so as to call his credibility into question. The court in no way prevented defendant from exploring this avenue. Why his counsel declined to do so is uncertain; whatever his reasons, however, the failure to place Niamet's credibility before the jury was defendant's counsel's fault, not the trial judge's. No sixth amendment violation occurred. Defen-

---

**5.** *See Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1131 n. 33 (5th Cir.1988), *petitions for cert. filed sub nom. Fryar v. Abell* and *Abell v. Wright, Lindsey & Jennings,* 57 U.S.L.W. 3636 (U.S. Mar. 13, 1989, and Mar. 14, 1989) (Nos. 88–1506, 88–1518); *United States v. Finney,* 714 F.2d 420, 423 (5th Cir.1983).

**6.** *See Finney,* 714 F.2d at 422; *United States v. Westmoreland,* 841 F.2d 572, 581 (5th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 62, 102 L.Ed.2d 39 (1988); *United States v. McDonald,* 837 F.2d 1287, 1293 (5th Cir.1988).

**7.** The indictment, tracking the relevant language of section 2314, charged that defendant "did cause to be transported in interstate commerce" the pipe in question.

**8.** Niamet's testimony was relevant to both the mail fraud counts and the transporting count, as it went to defendant's knowledge that pipe, including that implicated in count 22, was fraudulently obtained.

dant's conviction on count 22 therefore must stand.

## V. *Sentencing Challenges.*

In addition to challenging his conviction on the above grounds, defendant argues that his sentence was "based upon erroneous and material information or assumptions [so as to] violate due process." *United States v. Tobias*, 662 F.2d 381, 388 (5th Cir. Unit B Nov. 1981), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982). He maintains that the judge sentenced him based upon incorrect and unsupported assumptions and that this error requires that he be resentenced. *See Roussell v. Jeane*, 842 F.2d 1512, 1523–24 (5th Cir.1988). In particular, he asserts that the sentencing judge improperly considered statements to the effect that defendant's conduct had caused some of the defrauded companies to go out of business, resulting in hardship to employees and their families. He also asserts that the court improperly noticed an outside-the-record allegation that he had used an employer's name to obtain credit at a casino. Finally, citing Fed.R.Crim.P. 32(c)(3)(D) and *United States v. Garcia*, 821 F.2d 1051, 1052–53 (5th Cir.1987) (per curiam), defendant contends that even if the above factors may appropriately have been considered, it is still necessary to remand for resentencing because it is unclear how much weight the district court accorded them.

Although we seriously doubt that any of these arguments has ultimate merit,[9] we need not address them in concluding that a remand for resentencing is proper in this case. Defendant was convicted on 22 counts and received a complicated sentence allocated among these counts. Now that we have reversed the convictions on all but one count, we think it appropriate that he be resentenced on this count (count 22), as the original sentencing decision obviously was based upon an overview of the case that has changed dramatically. In remanding, we express no view as to whether

defendant should receive, on count 22, the same or a lesser or greater sentence than he received originally. As always, that decision rests within the discretion of the district court.

The judgment of the district court is AFFIRMED in part and REVERSED in part, the sentences are VACATED, and this matter is REMANDED to the district court for resentencing on count 22.

---

9. *See* 18 U.S.C. § 3661; *Roussell v. Jeane*, 842 F.2d 1512, 1523–24 (5th Cir.1988); *United States v. Fulbright*, 804 F.2d 847, 853 (5th Cir.1986); *United States v. Stovall*, 825 F.2d 817, 826 (5th Cir.), *modified on other grounds*, 833 F.2d 526 (5th Cir.1987) (per curiam).