Deon DAWSON, Petitioner,

v.

DONNELLY, Superintendent, Wende Correctional Facility, Respondent

No. 99–CV–6302(L)(FE).

United States District Court, W.D. New York.

Aug. 23, 2000.

Deon Dawson, Alden, NY, pro se.

Loretta S. Courtney, Monroe County District, Attorney's Office, Rochester, NY, for E.E. Donnelly Warden–Wende Correctional Facility, Warden, defendants.

## DECISION AND ORDER

LARIMER, District Judge.

### INTRODUCTION

Petitioner Deon Dawson was convicted of two counts each of murder, second degree, kidnaping, first degree and robbery, first degree in Monroe, New York, County Court, and sentenced to two consecutive terms of twenty-five years to life. On July 15, 1999, Dawson filed the present petition for habeas corpus under 28 U.S.C. § 2254. Dawson claims that his confession was improperly introduced at his trial, since it was the product of an arrest without probable cause and since he was denied counsel at the time of the confession. He also claims that the trial court improperly restricted his attorney's efforts to impeach a prosecution witness, that his conviction was improperly based on the uncorroborated testimony of an accomplice and that

his indictment was duplicitous. On August 29, 1999, the Monroe County District Attorney filed an answer, contesting each of the claims. (Item no. 5.)

Now, upon review of the parties' submissions, and upon consideration of the issues presented herein and applicable law, Petitioner's petition is denied and this action is dismissed, for the following reasons.

### BACKGROUND

Early in the morning of September 18, 1994, Dawson and three companions, Robert Orr, Ernest Douglas and Marble Spikes decided to rob someone. At about that time, Vicki Sollie and Richard Snyder got in an argument while driving in the vicinity of Dawson's house. Sollie stopped the car and got out. The four men approached her. Wielding a sawed-off shotgun, they ordered Sollie to get in the car and rode to a secluded alley. When they arrived at the alley, the four men removed the victims from the car and dragged them to a spot near some bushes. Dawson ordered the victims to lie down and shot both of them as they lay on the ground. (T390–94, 440–454.) [1]

Orr, Douglas and Spikes stayed together, driving Sollie's car to Buffalo, New York, before returning to Rochester. Meanwhile, the victims' bodies were discovered, and a description of Sollie's car was provided to Rochester police. That afternoon, an officer spotted the car, and the three men were arrested, following a high speed chase. Orr, Douglas and Spikes admitted robbing Sollie and Snyder, but they told police that Dawson had shot the victims. (T309–11, 456, 462–64.)

When Rochester police discovered that Dawson had fled the area and was staying with his grandmother in Cocoa, Florida, they requested the assistance of the Cocoa Police Department. On September 24,

---

1. References to the trial transcript are indicated by "T" followed by the page number(s). References to the suppression hearing are indicated by "H" followed by page number(s), except for the last day of the hearing. References to that day's proceedings, and to all other appearances are indicated by "App." followed by the date of the court appearance and page number(s).

1995, Captain Michael Blubaugh, who knew Dawson's grandmother, drove to her home. Initially, he was told that Dawson was not there. However, after a few minutes, Dawson came out of a rear bedroom. Blubaugh told Dawson that Rochester police wanted to speak with him about the murder of Sollie and Snyder. Dawson said he did not know anything about the homicides, and Blubaugh asked if he would go to the Cocoa police station, to speak by telephone with the Rochester police. Blubaugh informed Dawson that he was not under arrest. Dawson agreed to ride to the station, but requested that his girl friend accompany him. Blubaugh, who was off duty, drove Dawson and his girl friend to the station in his car. Dawson was not handcuffed in the car or at the station. When his grandmother and other relatives arrived at the station, they were permitted to meet privately with Dawson. Although Dawson contends that he was in custody at the station, he concedes that he had not been formally placed under arrest, and there is no indication that any officer threatened to arrest Dawson or indicated that he was not free to leave at any point during the interview. (496–502, 515–16.)

Prior to the police station interview, Blubaugh telephoned Rochester police, and spoke with Investigator Terrence Sheridan, who faxed Blubaugh a nine page summary of the co-suspects' statements implicating Dawson. Blubaugh gave *Miranda*[2] warnings to Dawson, and advised him that he planned to tape record the interview. They spoke for about an hour and a half. Detective Gordon Chase participated in some of the interview. Dawson admitted that he was with the other three suspects at the time Sollie and Snyder were killed, but he denied shooting either victim. He signed a written statement describing his involvement. Blubaugh left the interview room and telephoned Sheridan to inform him of Dawson's statement. Sheridan told Blubaugh that he planned to fly to Florida the next day and teletyped a request that

Cocoa police detain Dawson. Blubaugh was getting ready to go home when he heard a message over the loudspeaker telling him to return to the interview room. Blubaugh returned and spoke briefly with Dawson, who told him that his statement was true, except that "E" was the shooter, not "Jose." "E" was Ernest Douglas' nickname. "Jose" was Marble Spikes. On receiving the teletype, Cocoa police took Dawson to Brevard County Jail, where he was booked and detained. (T501–04, 535, H224–25.)

Sheridan and another Rochester Investigator, Terrence Coleman flew to Florida and spoke with Dawson about 6:00 p.m. the following day. After receiving another *Miranda* warning, Dawson gave the Rochester officers an oral statement. Sheridan typed the statement and Dawson signed it shortly after 7:00 p.m. Sheridan faxed Dawson's statement to the Rochester Police Department, where it was appended to an accusatory instrument and taken to the home of Hon. Charles Maloy, Monroe County Judge, who executed an arrest warrant. The warrant was faxed to Sheridan at the Cocoa Police Department shortly before midnight. (T317–33, 378–97, 339–47.)

Dawson waived his right to an extradition hearing before a Florida judge, and he was taken back to Rochester on September 27, 1994. A week later, the Monroe County Grand Jury returned an indictment charging Dawson with four counts of second degree murder (two counts for felony murder, and two counts for intentional murder), two counts of first degree kidnaping and four counts of first degree robbery.

Dawson's attorney, Maureen Pineau moved to suppress his confession. Monroe County Judge Nancy E. Smith held a four day suppression hearing, in January and February, 1995, at which Officers Blubaugh, Chase, Sheridan and Coleman and Judge Malloy testified, consistent with the

---

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

above description of events. (H5–115, 127–67, 194–211, 212–338, 337–47.) During the hearing, Pineau repeatedly stated that she had been stymied by Cocoa authorities in her efforts to obtain information related to a Federal investigation of Blubaugh and other Cocoa police officers. Pineau suggested that the investigation involved police investigative practices; however, it appears to have focused on gambling, at least with respect to Blubaugh.[3] The court accommodated Pineau by extending the time frame for the hearing, delaying deadlines for counsels' submissions, offering to re-open testimony if documents arrived and delaying issuance of its decision on the suppression motion. However, the information from Florida never arrived. As the date for a decision on the motion approached, Judge Smith stated that she could not wait any longer to render that decision. (H4–5, 51, 302, App. 2/15/95, at 74–77, App. 2/24/95, at 2–3.)

Pineau did get to cross-examine Blubaugh regarding the matter. The witness admitted that he was suspended from the police force subject to the outcome of an investigation by the Federal Bureau of Investigation (FBI) and Internal Revenue Service (IRS). He stated that he did not know the nature of charges against him; however, he denied that the investigation involved allegations that he had taken bribes during police investigations. (H118–21.) Blubaugh declined to answer other questions, invoking the Fifth Amendment privilege against self-incrimination. (T121.)

On March 9, 1995, Pineau again told the court that she had not received the requested information, and requested an adjournment of the trial. (App. 3/9/95, at 3.) Judge Smith denied the adjournment request, stating:

> [t]he Court is clueless as to what's going on and it certainly is not going to hold off this trial and disposing of this case forever because we don't know when whatever it is that you're looking for is going to come or what's going on.... I have given you time after time, adjournment after adjournment to try to get whatever it is that you're looking for.

(Id., at 7.) The judge then rendered her decision on the suppression motion. Finding that Dawson was not in custody when he gave his statement to Blubaugh, that the statement was given voluntarily following a *Miranda* warning, that the statement to Sheridan and Coleman was also voluntary, and that Dawson's right to counsel had not attached at the time of that statement the since Judge Maloy had not yet signed the arrest warrant, the judge held that Dawson's statements to Blubaugh and to the Rochester investigators were admissible at trial, and denied the motion. (Id. at 17–19.)

Immediately prior to the trial, the court, on the prosecution's motion, dismissed the two intentional murder counts, and two of the four robbery counts, leaving two counts each of felony-murder, kidnaping and robbery. (T7–8.) Pineau then made a final request for an adjournment, contending once again that she needed time to obtain information regarding the Federal investigation, and also that Cocoa Police Chief Richard Masten, whom she intended to call as a defense witness, might not be available. (T8–13.) Pineau also objected that Blubaugh's invocation of the Fifth Amendment would prevent her from effec-

---

3. News accounts of Blubaugh's trial, which took place after Dawson's trial, indicate that he was not charged with any Federal crime stemming from the investigation, and was subject only to state prosecution for gambling activities. *See* "Judge Orders Trial for Cops in Gambling Ring," *Florida Today*, March 13, 1997 (1997 WL 10106503); "1 of 2 Cocoa Cops Convicted. Blubaugh Found Guilty of State Gambling Charges," *Id.*, April 3, 1997 (1997 WL 10108017); "Blubaugh Gets House Arrest: Bookmaking Could Have Meant Prison," *Id.*, June 5, 1997 (1997 WL 10727789) The investigation also focused on Chase; however, he did not testify at Dawson's trial, and Dawson's habeas claims do not implicate the investigation as it relates to Chase.

tively cross examining him, and requested that Blubaugh's testimony regarding Dawson's confession be precluded. (T15.)

The court offered to "do anything I can to assist you in bringing Captain [sic] Masten to court," but declined to postpone the trial. (T17.) The court also denied the request to preclude Blubaugh's testimony, noting that Pineau was "certainly very effective" during the suppression hearing "in your cross-examination" of Blubaugh, and "in getting your point across, which has to do with [his] credibility." (Id.)

At the trial, Blubaugh described his interview with Dawson. (T494–504.) He acknowledged during direct examination that he had been suspended from the police force, stating that the suspension had nothing to do with Dawson's case. (T517.) On cross examination, he stated that he was suspended because of "an ongoing investigation for gambling" by the FBI and IRS, but denied that it involved allegations of racketeering. (T543–44.) Cross-examination focused on inconsistencies between the Dawson investigation and Cocoa police procedure, and on facts supporting Dawson's argument that he was under arrest at the time of the interview. (T518–73.)

Coleman and Sheridan also testified regarding their investigation, including their interrogation of Dawson. (T307–74, 375–432.) The prosecution also called Orr, who described the murders and identified Dawson as the one who shot both victims. (T439–93.) Ten other prosecution witnesses were called, mainly to testify regarding physical evidence, and other technical aspects of the investigation.

Over prosecution objection, the court permitted Masten to testify as a defense witness, "for the ... limited purpose of telling what the [police] regulations are in Cocoa, Florida." (T657.) The court stressed that Masten could not be used to "attack[ ]" Blubaugh, an apparent reference to questions related to the Federal investigation. (T660.) Pineau's examination of Masten focused on protocols for reporting investigations and securing evidence, and on inconsistencies between those protocols and the methods Blubaugh had employed. (T661–67.)

The only other defense witness, Robert Garland, a fingerprint expert, testified that he had not found Dawson's fingerprints on the victims' car. (T671–72.) On cross-examination, Garland offered numerous reasons why an individual's fingerprints might not be found, suggesting that the lack of prints was inconclusive on the question whether Dawson had ever been in the victims' car. (TT673–75.)

In her summation Pineau conceded that Blubaugh's suspension "doesn't tell you very much," but argued that his "conduct" of the investigation "tells you an awful lot" suggesting that flaws in the police procedure had undermined Blubaugh's credibility regarding his interrogation of Dawson. (T703–09.) The suspension was thus portrayed as incremental evidence of Blubaugh's alleged incompetence or dishonesty, rather than as a basis, in itself, for disbelieving Blubaugh.

The jury returned a verdict of guilty on all six counts. (T813–15.) Dawson was sentenced to two consecutive sentences of twenty-five years to life for the murder convictions, with concurrent sentences of twenty-five years to life for kidnaping, and eight ⅓ to twenty-five years for the robbery convictions. (App. 5/15/95, at 10–11.)

Dawson appealed the conviction, raising all of the claims in the present petition. The Appellate Division, Fourth Department affirmed the conviction. *People v. Dawson*, 249 A.D.2d 977, 672 N.Y.S.2d 203 (4th Dept.1998). Dawson applied for leave to appeal to the New York Court of Appeals, which denied the application. *People v. Dawson*, 93 N.Y.2d 872, 689 N.Y.S.2d 434, 711 N.E.2d 648 (1999).

## DISCUSSION

### I. STANDARD OF REVIEW

Since Dawson filed his habeas petition after enactment of the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, its provisions apply to the present proceeding. *Lindh v. Murphy*, 521 U.S. 320, 336–37, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

■ AEDPA strengthened the "presumption of correctness" to be accorded state court findings of fact, by adding the following underlined language:

> [i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. *The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.*

28 U.S.C § 2254(e)(1) (as renumbered by AEDPA.) This amendment "clearly raised the bar for habeas petitioners, placing on them the burden to show by clear and convincing evidence that the state court decision was defective in some way." *Smith v. Sullivan*, 1 F.Supp.2d 206, 210 (W.D.N.Y.1998). The touchstone for a reasonable determination under § 2254(e)(1) is " 'whether the determination is at least minimally consistent with the facts and circumstances of the case.' " *Sellan v. Kuhlman*, 63 F.Supp.2d 262, 267 (E.D.N.Y.1999) (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir.), cert. denied, 522 U.S. 819, 118 S.Ct. 72, 139 L.Ed.2d 32 (1997)).

In interpreting § 2254(e)(1)'s precursor, the Supreme Court defined the phrase "factual issue" to include "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators." *Thompson v. Keo-*

*hane*, 516 U.S. 99, 109–10, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). (Internal quotation omitted.) However, "mixed questions of law and fact" are generally not subject to this provision. *Thompson*, at 113, 116 S.Ct. 457.

AEDPA also revised the standard for deciding whether a state court properly interpreted Federal law. It provides:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court interpreted this language in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Justice O'Connor, writing for the majority, stated that a state court's decision is contrary to the Supreme Court's precedent "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" that of the Supreme Court. *Williams*, 529 U.S. at ——, 120 S.Ct. at 1519.[4]

---

4. A 6–3 majority in *Williams* held that the district court properly granted the habeas petition. Chief Justice Rehnquist and Justices Thomas and Scalia dissented, stating that the district court should have dismissed the petition, based on § 2254(d). 529 U.S. at ——, 120 S.Ct. at 1527. Justice O'Connor wrote for a 5–4 majority in Part II of the decision

which interprets the amended § 2254(d). *Id.,* at 1518–23. The five votes supporting Justice O'Connor included the three justices who dissented as to the outcome. Thus, although the reported decision correctly states that "Justice O'CONNOR delivered the opinion of the Court with respect to Part II," *id.,* at 1516, that opinion is not, strictly speaking, a "hold-

■ Justice O'Connor also stated that a state court decision is an unreasonable application of Supreme Court precedent if it

> identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.... [or] if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Id.* Under both the "contrary to" and "unreasonable application" standards, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court reached the wrong conclusion. Rather, the court's "inquiry should ask whether the state court's application of clearly established law was objectively unreasonable." 529 U.S. at ——, 120 S.Ct. at 1521.

## II. CHALLENGES TO THE ADMISSIBILITY OF DAWSON'S CONFESSION

Two of Dawson's claims challenge the admission of his confession into evidence at his trial. He contends that he was under arrest when he spoke to Blubaugh, that there was no probable cause to arrest him at that time, and therefore that his statements were obtained in violation of the Fourth Amendment prohibition of unreasonable seizures. He also claims that he was denied his Sixth Amendment right to counsel when he spoke to the Rochester police. (Pet.¶ 12(A), (B).)

The state court rendered the following holdings in Dawson's direct appeal.

> Defendant's statements to the police were properly admitted into evidence. The record supports the conclusions of County Court that defendant was not in custody when he was interviewed by a captain of the Cocoa Police Department and that he was given Miranda warnings and freely and voluntarily waived them.

> Defendant's statements to Rochester police officers in Florida were not obtained in violation of defendant's right to counsel. The record likewise supports the court's conclusion that the arrest warrant was not obtained until after defendant made the statements; therefore, defendant's indelible right to counsel had not yet attached at the time the statements were made. The execution of a search warrant at defendant's residence did not trigger defendant's indelible right to counsel.

*People v. Dawson,* 249 A.D.2d at 977–78, 672 N.Y.S.2d at 204.

### A. Arrest without Probable Cause

*Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) held that a confession obtained after arrest without probable cause was inadmissable at trial. The Supreme Court reasoned that custodial interrogation "intrudes so severely on interests protected by the Fourth Amendment" that an exclusionary rule must be applied "when there is a close causal connection between the illegal seizure and the confession." *Dawson,* 216–18. This exclusionary rule applies even when the confession is deemed voluntary. *Id.*

*Dunaway* arose on direct appeal from the prisoner's conviction and not in a habeas proceeding. The following term, *Stone v. Powell* held:

> where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

428 U.S. 465, 494, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). The Supreme Court reasoned that the exclusionary rule,

> is thought to encourage those who formulate law enforcement policies, and the officers who implement them, to incorpo-

ing," in that it is not a rationale in support of   the outcome of the case.

rate Fourth Amendment ideals into their value system. We adhere to the view that these considerations support the implementation of the exclusionary rule at trial and its enforcement on direct appeal of state-court convictions. But the additional contribution ... of the consideration of search-and-seizure claims of state prisoners on collateral review is small in relation to the costs.... Even if one rationally could assume that some additional incremental deterrent effect would be presented in isolated cases, the resulting advance of the legitimate goal of furthering Fourth Amendment rights would be outweighed by the acknowledged costs to other values vital to a rational system of criminal justice.

*Stone,* at 493–94, 96 S.Ct. 3037. *Stone* involved physical evidence seized in a search held to violate the Fourth Amendment. The Supreme Court subsequently held that the *Stone* doctrine also applies to a Fourth Amendment challenge to a confession, if it was voluntary and obtained in accordance with *Miranda. Cardwell v. Taylor,* 461 U.S. 571, 572–73, 103 S.Ct. 2015, 76 L.Ed.2d 333 (1983).

■ Dawson's first claim, that he was under arrest when he confessed and that there was no probable cause for his arrest, is a classic *Dunaway* claim. Dawson raised the claim in a pretrial motion to suppress his confessions and included it in his direct appeal. Both the state trial court and appellate court gave Stone a full and fair opportunity to litigate the claim. Therefore, this Court is precluded from addressing it in the context of a Federal habeas proceeding, and the claim must be dismissed.

Further, the state appellate decision was neither contrary to nor based on an unreasonable application of Federal law, as defined by the Supreme Court. Indeed, the decision is quite consistent with Supreme Court precedent. Therefore, even if this Court were permitted to address the merits of Dawson's Fourth Amendment challenge to his confession, the Court would be compelled to dismiss that claim on the merits under § 2254(d). *Williams v. Taylor,* 529 U.S. at ——––——, 120 S.Ct. at 1510–11.

## B. Right to Counsel at the Time of the Confession

The record clearly establishes that Dawson was given *Miranda* warnings prior to speaking with Blubaugh, and again before speaking with the Rochester detectives. Both times, Dawson waived his right to have an attorney present and voluntarily spoke with the officers. Thus, his claim is premised solely on the Sixth Amendment right to counsel, not on the Fifth Amendment privilege against self incrimination.

■ Although the privilege against self-incrimination requires that counsel be appointed if requested by a suspect subjected to a custodial police interrogation, *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602, the Sixth Amendment right to counsel does not exist until "the initiation of adversary criminal proceedings." *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). Initiation of criminal proceedings which implicates the right to counsel involves a " 'formal charge, preliminary hearing, indictment, information, or arraignment.' " *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) quoting *United States v. Gouveia,* 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984).

■ Dawson contends that his right to counsel attached when Judge Maloy issued his arrest warrant, that the warrant was issued before Rochester detectives spoke with him and that police intentionally delayed transmitting the warrant to Florida. However, Judge Smith found that Dawson's confession preceded the warrant. That finding of a "historical" fact, *Thompson,* 516 U.S. at 110, 116 S.Ct. 457, is presumed correct under § 2254(e)(1), unless rebutted by clear and convincing evidence. Dawson has not come forward

with any evidence that credibly rebuts Judge Smith's finding. His argument is premised on speculation regarding the sequence of events and contradicts prosecution witnesses' testimony that his statement to the Rochester detectives was a basis for obtaining the arrest warrant. Dawson's second claim must therefore be dismissed.

## III. TRIAL COURT RULINGS

Dawson claims that the trial judge improperly impeded his counsel's efforts to impeach Captain Blubaugh in the following ways: 1) By permitting Blubaugh to testify after he had invoked his Fifth Amendment privilege against self-incrimination, the judge effectively prevented counsel from cross examining the witness; 2) The judge prevented counsel from asking Police Chief Masten about the Federal investigation; 3) The judge refused to grant an adjournment of the trial so that defense counsel could obtain documents related to the Federal investigation. (Petition ¶ 12(D)(E).)

Dawson claims that these rulings violated his Sixth Amendment rights to confront his accusers and to the effective assistance of counsel. His claims are premised on the assumption that the Federal investigation of Blubaugh was highly relevant and material to the determination of Dawson's guilt or innocence. However, the trial court consistently ruled that the investigation was a collateral issue, and that determination was upheld by the state appellate court. *Dawson,* 249 A.D.2d at 978, 672 N.Y.S.2d 203. As discussed below, the trial court's rulings, which were based on valid evidentiary premises and on concern for judicial economy, did not deny Dawson his right to confront witnesses or to the effective assistance of counsel.

### A. Confrontation Clause

■ The Confrontation Clause provides: "[i]n all prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const.

Amend. VI. It is made applicable to the states through the Fourteenth Amendment, *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

> [T]he main and essential purpose of confrontation is to secure for the [defendant] the opportunity of cross-examination.... It does not follow, of course, that the Confrontation Clause ... prevents a trial judge from imposing any limits on defense counsel's inquiry .... On the contrary, trial judges retain wide latitude ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant... [T]he Confrontation Clause guarantees an *opportunity* for effective cross examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (Emphasis in original, internal citations omitted.) " 'Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a discriminating appraisal of the particular witness's credibility,' " *United States v. Beverly,* 5 F.3d 633, 638 (2nd Cir.1993) (internal citation omitted), and

> the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.

*Delaware v. Fensterer,* 474 U.S. 15, 22, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985).

■ The trial court did not prevent counsel from asking Blubaugh about the Federal investigation during the suppression hearing or at the trial. Blubaugh admitted at trial that he was suspended from the Cocoa police force because of the

joint FBI and IRS investigation into gambling on the police force. The trial judge ruled that the Federal investigation was a collateral issue, and therefore Pineau could not impeach Blubaugh by questioning Police Chief Masten about it. The gambling investigation was not the only basis for impeaching Blubaugh. Indeed, Pineau focused primarily on the ways Blubaugh's methodology violated Cocoa police protocols. Thus, although she referred to Blubaugh's suspension in her summation, the thrust of her argument was that flaws in the methodology tainted the Dawson investigation. Although the jury apparently did not accept this line of reasoning, the points that Pineau emphasized appear to have been a good deal more germane to the witness' credibility than the gambling investigation. Counsel was able to present a fair amount of material for the jury to consider in assessing Blubaugh's testimony.

█ Dawson claims that Blubaugh's invocation of the Fifth Amendment infringed his right to confront his accuser and therefore that the trial judge should have stricken Blubaugh's testimony. However, there is no reason to believe that anything that Blubaugh might have admitted regarding the Federal investigation would have led to the exclusion of Dawson's confession, or led the jury to disregard or disbelieve the contents of that confession.[5] Blubaugh's invocation of the Fifth Amendment did not significantly impair Dawson's right to confront his accusers.

█ Also, the court properly ruled that counsel could not question Masten on the investigation of Blubaugh. In New York, as in most jurisdictions, extrinsic evidence cannot be used to impeach a witness on a collateral issue. As the Second Circuit held in *United States v. Sasso*, 59 F.3d 341, 348 (2nd Cir.1995), exclusion of extrinsic evidence purporting to impeach a prosecution witness on a collateral issue is not an "improper limitation on cross-examination" under the Confrontation Clause.[6] Finally, as discussed below, denial of Pineau's adjournment request was a proper exercise of discretion that did not significantly impact her effort to impeach Blubaugh.

There is no merit to Dawson's fifth claim, and it must be dismissed.

## B. Ineffective Assistance of Counsel

Immediately prior to the trial, Pineau requested an adjournment, in part because she had not obtained information regarding the Federal investigation of Blubaugh. (T8.) Judge Smith declined to grant a further adjournment of the trial. (T17.) In Dawson's direct appeal, the appellate court held:

[t]he court did not abuse its discretion in denying defendant's request for an adjournment to enable defense counsel to obtain information from Florida with which to impeach the testimony of the captain of the Cocoa Police Department, a prosecution witness. The request was based upon conclusory allegations of necessity, counsel failed to identify specifically the documents that she was seeking, and she could not provide the court with assurances that the material she was seeking would be available by a certain date. In any event, the material

---

5. Judge Smith charged the jury to consider Dawson's confession only if it determined, beyond a reasonable doubt, that the confession was voluntary and truthful. (T765–70.)

6. When a defendant seeks to elicit testimony from one witness that purports to impeach prosecution testimony by another witness, the issue is sometimes treated as a claim under the Compulsory Process Clause rather than the Confrontation Clause. *See Roussell v. Jeane*, 842 F.2d 1512, 1516 (5th Cir.1988).

However, analysis of the underlying Constitutional claim is identical. Thus, *Roussell* held that a defendant's Sixth Amendment right to call witnesses is not absolute, but must yield to evidentiary rules excluding irrelevant and immaterial testimony. 842 F.2d at 1521–22. Therefore, to the extent that Dawson's *pro se* petition can be construed as also raising a Compulsory Process claim, that claim must be dismissed for the above stated reasons.

was sought to impeach the testimony of that witness on collateral issues of credibility.

*People v. Dawson,* 249 A.D.2d at 978, 672 N.Y.S.2d 203. That holding is both factually accurate and legally proper. Despite defense counsel's protestations, the trial record indicates that she performed capably in impeaching Captain Blubaugh, both through cross-examination of Blubaugh and through Masten's testimony. Also, there is no indication that counsel would have obtained any "smoking gun" in the nature of documentation or information related to the Federal investigation that would have had a significant impact on the jury's consideration of Blubaugh's testimony.

The Sixth Amendment, which provides, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense," guarantees a defendant's right to the effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

> [T]he right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect . . . on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated

*United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); cf. *Strickland,* at 691, 104 S.Ct. 2052.

There are rare instances in which circumstances bearing upon defense counsel's performance are so severe that ·

> the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.

*Cronic,* at 659–60, 104 S.Ct. 2039, citing *Powell v. Alabama,* 287 U.S. 45, 53, 53 S.Ct. 55, 77 L.Ed. 158 (1932). In *Powell,*

the trial of seven black men accused of raping two white girls took place in "an atmosphere of tense, hostile and excited public sentiment." At one point, the state militia was called in to prevent defendants' lynching. Noting the trial court's equivocation and defense attorneys' "dubious understanding" as to their role at the trial, the Supreme Court held that the attorney's participation was "pro forma" and that defendants were denied their right to counsel. *Powell,* at 57–60, 53 S.Ct. 55.

Apart from such extraordinarily situations, however, external factors impinging on counsel's performance cannot be deemed *per se* a denial of effective assistance. Such a claim requires a specific showing of how the external factors affected the conduct of the trial. *Cronic,* at 659 n. 26, 104 S.Ct. 2039, citing *Strickland,* at 693–96, 104 S.Ct. 2052. In particular,

> [n]ot every restriction on counsel's time or opportunity to investigate or . . . otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel. Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel.

*Morris v. Slappy,* 461 U.S. 1, 11–12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). (Internal citations omitted.) It is up to the petitioner to show the specific ways in which counsel was prevented from adequately presenting his defense because of the trial court's denial of the adjournment. *Cronic,* at 661–62, 104 S.Ct. 2039, citing *Avery v. Alabama,* 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940).

■ Dawson has not shown that his attorney's efforts were significantly impaired by the denial of an adjournment. As the state court noted, the adjournment request was based on unfounded, conclusory assertions as to impeachment information that counsel hoped to obtain. There is no indication that any information that counsel might have obtained would have been material to Dawson's trial, much less that such material might have affected the outcome of the trial.

Also, to the extent that Dawson also premises his ineffective assistance claim on the trial rulings vis-a-vis the questioning of Blubaugh and Masten, those rulings, as discussed above, were a proper exercise of judicial discretion, and there is no basis for finding that they improperly impeded Pineau's efforts to represent Dawson.

The state court determination is consistent with due process requirements as defined by the Supreme Court, and there is no basis for finding that it is contrary to or a unreasonable application of Federal law. 28 U.S.C. § 2254(d). Dawson's fourth claim must therefore be dismissed.

## IV. DAWSON'S OTHER CLAIMS

Dawson also claims that his conviction was improperly based on the uncorroborated testimony of an accomplice, and that his indictment was duplicitous.

### A. Accomplice Testimony

■ When a federal habeas petitioner challenges the sufficiency of the evidence,

[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Therefore, " '[a] conviction may be sustained on the basis of the testimony of a single accomplice, so long as that testimony is not

incredible on its face and is capable of establishing guilt beyond a reasonable doubt.' " *United States v. Diaz,* 176 F.3d 52, 92 (2nd Cir.1999), quoting *United States v. Gordon,* 987 F.2d 902, 906 (2nd Cir.1993). Corroboration or lack of corroboration of an accomplice's testimony goes "to the weight of the evidence and not its sufficiency," *Diaz, id.* Although New York Criminal Procedure Law ("CPL") § 60.22(1) provides that a defendant may not be convicted of any offense upon the uncorroborated testimony of an accomplice, this is a state law and not a Constitutional requirement, and may not be raised in a Federal habeas petition. Also, Orr's testimony was corroborated by Dawson's confession.

Dawson's third claim must therefore be dismissed.

### B. Duplicitous Indictment

Dawson's petition does not elaborate on his claim that his indictment was duplicitous. In his appeal, he argued that the indictment violated the Sixth Amendment, which requires that an accusatory instrument provide an accused with fair notice of the charges against him, and CPL § 200.30, which requires that each count of an indictment specify only one offence. To the extent that it is premised on the CPL, Dawson's claim does not state a Federal law basis for the relief he seeks.

■ To comport with the Sixth Amendment "fair notice" requirement,

a criminal indictment must (1) contain all of the elements of the offense so as to fairly inform the defendant of the charges against him, and (2) enable the defendant to plead double jeopardy in defense of future prosecutions for the same offense.

*United States v. Santeramo,* 45 F.3d 622, 624 (2nd Cir.1995), citing *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). Dawson's indictment spells out his involvement in each of the charged crimes, includes all the

essential elements of the offenses. There is no indication that counsel was hampered by any ambiguity as to the factual or legal basis for the charges against Dawson. Also, Dawson clearly would be able to plead double jeopardy if he were ever charged with any crimes in relation to the robbery, kidnaping and murder of Sollie and Snyder.

■ Dawson's assertion that the indictment is duplicitous apparently refers to the two murder counts, both of which specify two different felonies—kidnaping and robbery—as the basis for the felony murder charge. However, the indictment is quite clear as to how Dawson's involvement meets the requirements of New York's felony murder statute. The wording of the indictment properly required that the jury find that Sollie and Snyder were killed in the course of one of the felonies specified in the felony murder statute, Penal Law § 125.25(3). Under New York law, "in felony murder the underlying felony is not so much an element of the crime but instead functions as a replacement for the *mens rea* or intent necessary for common-law murder." *People v. Berzups*, 49 N.Y.2d 417, 427, 426 N.Y.S.2d 253, 402 N.E.2d 1155 (1980). Therefore, it was not necessary, as a matter of due process, that the jury be unanimous in finding which felony—kidnaping or robbery—was in progress at the time of the killings. As the Supreme Court held in *Schad v. Arizona*, 501 U.S. 624, 630, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), "Petitioner's jury was unanimous in deciding that the State had proved what, under state law, it had to prove." In any event, Dawson was convicted of all four underlying felonies: two counts of kidnaping and two counts of robbery, and he cannot complain that ambiguity in the indictment may have led to an non-unanimous verdict. Dawson's duplicitous indictment claim must therefore be dismissed.

### CONCLUSION

For the above stated reasons, Petitioner's petition for habeas corpus under 28 U.S.C. § 2254 is DENIED, and this proceeding is DISMISSED. Further, because Lyon has failed to make a substantial showing of a denial of a constitutional right, I deny a certificate of appealability. 28 U.S.C. § 2253.

### ORDER

It is hereby ORDERED that Petitioner's petition for habeas corpus under 28 U.S.C. § 2254 is DENIED, and the proceeding is DISMISSED.

FURTHER, that the clerk of the court is directed to enter judgment in favor of defendants and against plaintiff.

IT IS SO ORDERED